IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JORGE ALBERTO SAINZ NAVARRETE,<br><br>Defendant. | 8:16-CR-248<br><br>ORDER ON DEFENDANT'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 |

This matter is before the Court on defendant Jorge Alberto Sainz Navarrete's *pro se* Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. Filing 496. The Motion contains four grounds for relief, including a claim of actual innocence. Filing 496 at 9. In 2018, the defendant was found guilty at trial of conspiring to distribute methamphetamine in violation of 21 U.S.C. §§ 841 and 846, money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and two counts of conspiring to launder money in violation of 18 U.S.C. § 1956(h). Filing 350 (Jury Verdict). The late Judge Smith Camp sentenced the defendant to life imprisonment on the drug conspiracy charge and concurrent 240-month terms on the other charges. Filing 461 (Amended Judgment). The defendant appealed, and the Eighth Circuit Court of Appeals affirmed the conviction and sentence in April 2020. Filing 468. The defendant filed the instant Motion in May 2025, well beyond the usual one-year statute of limitations detailed in 28 U.S.C. § 2255(f). Filing 496 at 1 (the defendant acknowledging that his "motion is outside of the one-year limitations period prescribed by § 2255(f)"). But the defendant contends that he is entitled to avail himself of the equitable exception to the statute of limitations recognized by *McQuiggin v. Perkins*, 569 U.S. 383 (2013), applicable to prisoners who sufficiently allege actual innocence. Filing 496 at 1. For

1

the reasons stated below, the equitable exception is inapplicable here, and the defendant's Motion is denied as untimely.

## I. INTRODUCTION

### A. Factual Background

The defendant's primary argument for relief is that the Government's evidence was comprised of unreliable testimony by self-interested coconspirators "without substantial corroboration." Filing 496 at 3–4. He avers that he has "newly discovered impeachment evidence" against those witnesses that "demonstrate innocence." Filing 496 at 9 (capitalization omitted). The Eighth Circuit described the facts of this case in detail, as follows:

> During a seven-day jury trial, several witnesses testified that Navarrete directed them to transport methamphetamine from Arizona to Nebraska, distribute it in the Omaha area, and remit the proceeds to him. Maria Diaz testified that she was "the one taking charge of everything" for Navarrete. She recruited drivers to transport vehicles from Arizona to Omaha that contained methamphetamine in hidden compartments, including in a cavity behind the wheel of a PT Cruiser. She stated that the drivers went on at least six trips and that, on each trip, at least eight to 12 pounds of methamphetamine were concealed within their vehicles. Maria Diaz then arranged to have the methamphetamine removed from the vehicles and distributed in the Omaha area. She testified that her friend Alvaro Dominguez and her cousin Adrian Vega assisted with retrieving and distributing the methamphetamine.
> Three of the drivers that Maria Diaz recruited—Deyanira Castaneda, Francisco Cano-Salgado, and Nathalie Martinez—testified at trial. They each stated that they drove or towed vehicles from Phoenix to Omaha at Navarrete's request. Castaneda said that she was told they were transporting "hielo," which she understood to mean methamphetamine, and that she observed round, burrito-sized packages being removed from behind the front wheel of a PT Cruiser after she helped transport it to Omaha. Cano-Salgado testified that he similarly observed "wrapped foot-long sized things" being removed from the PT Cruiser. Martinez testified that, after she helped transport the PT Cruiser from Phoenix to Omaha, she saw Dominguez, Castaneda, and another person enter a garage with tools and jack up the PT Cruiser. She saw debris on the floor and believed that they removed something from the car. On another occasion, Martinez observed Dominguez and others sawing into a white car and removing items wrapped in plastic bags.
> Martinez testified that she later began selling methamphetamine for Navarrete. She got the methamphetamine from Dominguez, but Navarrete set the price. Vega also testified that he sold methamphetamine for Navarrete. He obtained it either from Maria Diaz or by removing it himself from cavities in cars. Vega

initially reported to Maria Diaz or Dominguez, but he later reported directly to Navarrete.

Adam Trevino testified that he purchased approximately 100 pounds of methamphetamine from Navarrete and that Maria Diaz and Vega delivered it to him. Trevino later began cooperating with the government and, in June and July 2016, he made controlled purchases of methamphetamine from Vega. During one of these transactions, Vega called Navarrete because Navarrete wanted to talk to Trevino. The government also made controlled purchases of methamphetamine from Oscar Mayorga, who stated that Navarrete was his supplier.

Maria Diaz and Vega both testified that Navarrete directed them to deposit the proceeds from their methamphetamine sales into specific bank accounts. Maria Diaz stated that she recruited others to make the deposits for her, including Castaneda, Cano-Salgado, and Sindy Renteria. Castaneda and Cano-Salgado confirmed that they deposited cash into Wells Fargo bank accounts at Maria Diaz's request.

Maria Diaz and Vega documented these transactions by taking photos of the receipts and by recording in notebooks the amounts that they received from their sales and the amounts that were wired or deposited at Navarrete's request. The government later seized these notebooks and introduced them at trial. The government also found Maria Diaz and Dominguez in possession of methamphetamine, cash, money-transfer receipts, and a phone containing contact information for Navarrete and other associates. The government found a PT Cruiser with a hidden cavity behind the front wheel in the garage of a house where Maria Diaz and Dominguez used to live.

One of the Wells Fargo bank accounts that received methamphetamine proceeds was an account that Navarrete had asked his girlfriend, Karla Diaz, to open in her name. Karla Diaz testified that Navarrete asked her to open the account based on the representation, later shown to be false, that he did not have identification. Karla Diaz stated that she considered the money in the account to be Navarrete's and that she would not withdraw money from it without Navarrete's permission.

The government introduced bank records and photographs showing that Vega, Cano-Salgado, and Renteria made cash deposits into Karla Diaz's Wells Fargo account. Text messages showed that Navarrete also told Trevino to make deposits into that account. Shortly after these deposits were made in the Omaha area, Karla Diaz withdrew roughly corresponding amounts from the account in Arizona. Karla Diaz testified that Navarrete directed her to make these withdrawals and that she gave him the money after she withdrew it. On June 2, 2016, Navarrete accompanied Karla Diaz to withdraw $2,000 cash from the account in Arizona. Vega had deposited $2,000 cash into the account in Omaha earlier that day.

In March 2016, Navarrete purchased a Corvette from Juan Carlos Ruiz at a used-car business in Omaha. Ruiz testified that he sold the car for a series of cash payments totaling $8,000. The purchase agreement listed Karla Diaz as the buyer and purported to contain her signature. However, Karla Diaz testified that she did not buy the Corvette and that the signature was not hers. She said that Navarrete had told her that he purchased the Corvette. Maria Diaz testified that, shortly after

she first saw the Corvette, Navarrete asked her to go to the used-car business to make the final $4,000 payment and to pick up the car title. Maria Diaz used methamphetamine proceeds to complete the transaction and later gave the title to Navarrete.

Navarrete was arrested in November 2016. Officers seized a phone from him that contained photographs of bank-deposit receipts, the number for Karla Diaz's Wells Fargo account, wire-transfer communications, and the notebooks Maria Diaz and Vega had used to record their transactions. Navarrete's wallet also contained a business card with Karla Diaz's Wells Fargo account number on it and a business card for Ruiz's used-car business.

Filing 467 at 2–5; *see also United States v. Sainz Navarrete*, 955 F.3d 713, 716–18 (8th Cir. 2020).

The defendant avers that he has discovered "new evidence" since his trial that demonstrates actual innocence. Filing 496 at 9–10. This purported evidence is as follows:

- Maria Diaz, the Government's lead witness, concealed the extent of her ongoing drug trafficking activities and financial benefits received in exchange for her cooperation. Subsequent disclosures reveal that she engaged in drug transactions even while cooperating, contradicting her sworn testimony about ceasing illegal activities.
- Adrian Vega materially misrepresented his drug proceeds and involvement during his cooperation. Later investigative reports uncovered that Vega continued criminal activities while purportedly acting as a Government informant, a fact not disclosed at trial.
- Adam Trevino, another key witness, exaggerated his connections to Navarrete and minimized his independent drug trafficking operation. Newly obtained evidence shows Trevino was engaged in extensive methamphetamine distribution independently, calling into question his claims about Navarrete being his primary supplier.

Filing 496 at 9–10.

### B. Procedural Background

The defendant filed the instant Motion in May 2025, over five years after his conviction and sentence were affirmed by the Eighth Circuit Court of Appeals. Filing 496. The defendant's grounds for relief are as follows: "The Government's Case Relied on Unreliable, Uncorroborated Testimony"; "The Drug Quantity Finding Was Speculative and Unsupported by Independent Evidence"; "The Money Laundering Convictions Were Based on Weak and Circumstantial

Evidence"; and "Newly Discovered Evidence and Material Impeachment Further Demonstrate Innocence."[1] Filing 496.

## II. LEGAL ANALYSIS

### A. Applicable Standards

Normally, a one-year statute of limitations applies to any Motion to Vacate, Set Aside, or Correct Sentence. 28 U.S.C. § 2255(f). The defendant acknowledges that his Motion is outside this one-year period. Filing 496 at 1. But "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . [or] expiration of the statute of limitations." *McQuiggen*, 569 U.S. at 393. The Supreme Court cautioned "that tenable actual-innocence gateway pleas are rare: A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Stated differently, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536–37 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Thus, if the defendant can demonstrate that his new evidence would likely have prevented a guilty verdict, the Court may consider the merits of his Motion. Otherwise, the defendant's Motion to Vacate, Set Aside, or Correct Sentence is barred by the statute of limitations.

---

[1] Although the defendant lists actual innocence as a ground for relief, actual innocence has not been recognized as a cognizable, independent claim under 28 U.S.C. § 2255 by the Supreme Court or Eighth Circuit. "The actual innocence showing excuses a procedural bar. It does not constitute an independent substantive claim." Brian R. Means, *Federal Habeas Manual* § 9B:84 (West 2024) (citing *Herrera v. Collins*, 506 U.S. 390 (1993)); *cf. Rouse v. United States*, 14 F.4th 795, 801 n.4 (8th Cir. 2021) ("[I]t is an open question whether such freestanding claims of actual innocence are cognizable." (citing *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013))).

5

### B. The Equitable Exception to the Statute of Limitations For Actual Innocence Is Inapplicable Here

The defendant's purported "newly discovered evidence" indicates that three witnesses who testified against the defendant at trial were themselves criminals. Filing 496 at 9–10. The defendant's apparent argument is that reasonable jurors would likely have not found him guilty had they known about additional criminal behavior by the three witnesses named by the defendant in his Motion. But the jury heard already heard inculpatory testimony at trial about each witness named by the defendant in his Motion. Maria Diaz, described by the defendant as "the Government's lead witness," Filing 496 at 9, testified to assisting the defendant in his drug trafficking operation by "recruiting drivers to transport vehicles from Arizona to Omaha that contained methamphetamine in hidden compartments, including in a cavity behind the wheel of a PT Cruiser." Filing 467 at 2. Ms. Diaz also testified that her cousin, the defendant's second witness Adrian Vega, "assisted with retrieving and distributing the methamphetamine." Filing 467 at 2. Finally, the defendant's third witness "Adam Trevino testified that he purchased approximately 100 pounds of methamphetamine from Navarrete and that Maria Diaz and [Adrian] Vega delivered it to him." Filing 467 at 3.

The defendant has not "persuade[d] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt," *McQuiggen*, 569 U.S. at 393, for several reasons. First, the jury already knew that these witnesses had committed very serious crimes involving substantial amounts of methamphetamine. In this context, knowledge of any additional drug-related activity would offer little probative value and would not sway a reasonable juror from his or her earlier conclusion. Second, numerous other witnesses testified against the defendant, including "[t]hree of the drivers that Maria Diaz recruited—Deyanira Castaneda, Francisco Cano-Salgado, and Nathalie Martinez." Filing 467 at 2.

Even had the defendant been able to impeach the three witnesses named in his Motion, sufficient independent evidence existed for a reasonable jury to find the defendant guilty beyond a reasonable doubt. Third, there was physical evidence that tied the defendant to distributing methamphetamine and to money laundering. Two coconspirators were arrested "in possession of methamphetamine, cash, money-transfer receipts, and a phone containing contact information for Navarrete and other associates." Filing 467 at 3–4. The defendant himself was arrested with "a phone . . . that contained photographs of bank-deposit receipts, the number for [a coconspirator's] Wells Fargo account, wire-transfer communications, and the notebooks Maria Diaz and Vega had used to record their transactions." Filing 467 at 5. As the Eighth Circuit held, the evidence against the defendant at trial was "sufficient . . . for a reasonable juror to conclude, beyond a reasonable doubt," that the defendant was guilty of drug-distribution and money-laundering offenses. Filing 467 at 7. The defendant's "newly discovered evidence" would not have changed that conclusion.

Because the defendant has not demonstrated "actual innocence" to establish an equitable exception to the statute of limitations, his Motion is untimely. *McQuiggen*, 569 U.S. at 393. Accordingly, the defendant's Motion is denied.

### C.  Certificate of Appealability

No appeal may be taken on an order denying a motion under 28 U.S.C. § 2255 unless a judge issues a certificate of appealability, which requires the appellant to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(1)–(2). To make "a substantial showing of the denial of a constitutional right" after the district court denies a constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a petition is denied on procedural grounds, a petitioner is entitled to a certificate of appealability if the petitioner "shows, at least, that jurists of reason would find it

7

debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Reasonable jurists would not find the Court's decision debatable. The defendant's Motion under 28 U.S.C. § 2255 is untimely, and his "new evidence" is insufficient to establish an equitable exception to the statute of limitations. Therefore, the Court will not issue a certificate of appealability.

### III. CONCLUSION

The defendant's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 is well outside the statute of limitations, and the defendant has not demonstrated that he is entitled to an equitable exception due to "actual innocence." The Court therefore does not reach the merits of the claims in his Motion. A certificate of appealability will not issue. Accordingly,

IT IS ORDERED that the defendant's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255, Filing 496, is denied.

Dated this 15th day of July, 2025.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge